1  Christopher C. Saldaña, Esq. (SBN 269456)
   chris@shewrysaldanalaw.com
2  **SHEWRY & SALDAÑA, LLP**
   402 West Broadway, Suite 950
3  San Diego, California 92101
   Telephone:   (619) 233-8824
4  Facsimile:   (619) 233-1002

5  Ryan Conger, Esq. (SBN 248390)
   ryan@congerlawfirm.com
6  **CONGER LAW**
   402 W Broadway, Suite 950
7  San Diego, California 92101
   Telephone: (619) 569-1919
8  Facsimile: (619) 569-1976

9  Attorneys for Plaintiffs MARCUS ALFARO,
10 DERRIN AUSTIN and PIPER DENLINGER

11              **UNITED STATES DISTRICT COURT**

12              **SOUTHERN DISTRICT OF CALIFORNIA**

13  MARCUS ALFARO, an individual;          ) Case No.:  3:17-CV-00046-H-KSC
14  DERRIN AUSTIN, an individual; and      )
    PIPER DENLINGER, an individual,        ) **PLAINTIFFS' MEMORANDUM**
15                                         ) **OF POINTS AND AUTHORITIES**
                                           ) **IN SUPPORT OF MOTION FOR**
16                       Plaintiffs,       ) **SUMMARY JUDGMENT**
17  v.                                     )
                                           )
18  CITY OF SAN DIEGO, a California        )
    Municipal Corporation; and BRIAN      )
19  FENNESSY, individually and in his      ) Date: May 6, 2019
    official capacity as Chief of the SAN  ) Time: 10:30 am.
20  DIEGO FIRE-RESCUE                      ) Courtroom: 15A
    DEPARTMENT,                            )
21                                         )
                                           ) Complaint Filed: January 10, 2017
22                       Defendants.       ) District Judge:  Marilyn L. Huff
23                                         ) Magistrate Judge: Karen S. Crawford

24

25

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................ 1

II. BACKGROUND / STATEMENT OF FACTS ................................. 2

III. ARGUMENT ................................................................................. 3

    A. Standards for Summary Judgment ..................................... 3

    B. Plaintiffs Alfaro, Austin and Denlinger Were Non-Exempt Employees Pursuant to *Haro* and *Cleveland* And, Therefore, Were Entitled To Overtime Pay .................................................. 3

    C. The City Wildly Mischaracterizes Both the Haro Holding and the Facts of this Case ............................................................ 7

        1. Defendants' Contention: Plaintiffs Were Trained in Fire Suppression .............................................................. 7

        2. Defendants' Contention: Plaintiffs had the "legal responsibility to engage in fire suppression" ............... 7

        3. Defendants' Contention: Plaintiffs were "engaged in the response to emergency situations where life, property, or the environment was at risk" ................................ 8

        4. The 11th Circuit Cases Cited By Defendants Are Neither Controlling Law Nor Applicable to the Facts of this Case ...... 10

    D. Plaintiffs Were Not Exempt Under The Administrative Exemption ......................................................................... 11

    E. Plaintiffs Have Established a Prima-Facie Case of Retaliation & Defendants Cannot Carry Their Burden Under McDonnell-Douglas .............................................................................. 13

        1. Plaintiffs' Prima-Facie Case ..................................... 13

    F. The Statute of Limitations Should Be Extended and Plaintiffs Are Entitled To Both Liquidated And Punitive Damages ................. 16

        1. In This Case, The City is Making the Exact Same Argument that it Knows was Rejected in *Haro* and *Cleveland* – Proving that its Position is Both Incorrect and Willful ............................................................. 16

        2. Equitable Estoppel Applies Here As Well ................. 23

    G. Plaintiffs' Damages ........................................................... 25

IV. CONCLUSION ........................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

CASES

*Alvarez v. IBP, Inc.,*
   339 F.3d 894, 908–09 (9th Cir.2003) .................................................... 16, 19, 20

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 247 (1986) ........................................................................ 3

*Atkins v. Union Pac. R. Co.,*
   753 F.2d 776, 777 (9th Cir. 1985) .......................................................... 25

*Avila v. Los Angeles Police Dep't,*
   758 F.3d 1096, 1101 (9th Cir.2014) ....................................................... 13

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 323 (1986) ........................................................................ 3

*Chao v. A-1 Medical Servcs., Inc.,*
   346 F.3d 908, 919–20 (9th Cir. 2003) .................................................... 20

*Chavez v. City of Los Angeles,*
   111 Fed.Appx. 881, 884 (9th Cir. 2004) ................................................ 15

*Chevron Corp. v. Penzoil Co.,*
   974 F.2d 1156, 1162 (9th Cir. 1992) ...................................................... 21

*Chiron Corp. v. Genentech, Inc.,*
   179 F. Supp. 2d 1182, 1185 (E.D. Cal. 2001) ....................................... 21

*Cleveland v. City of Los Angeles,*
   420 F.3d 981 (9th Cir. 2005)…………………………………………...passim

*Copas v. E. Bay Mun. Util. Dist.,*
   61 F. Supp. 2d 1017, 1021 (N.D. Cal. 1999) ......................................... 12

*Coszalter v. City of Salem,*
   320 F.3d 968, 977 (9th Cir.2003) ........................................................... 14

*Fonseca v. Sysco Food Servs. of Ariz., Inc.,*
   374 F.3d 840, 847–48 (9th Cir.2004) ..................................................... 15

*Haro v. City of Los Angeles,*
   745 F.3d 1249 (9th Cir. 2014)…………………………………………...passim

*Holland v. Norwegian Cruise Lines,*
   765 F. Supp. 1000, 1002-03 (N.D. Cal. 1990) ....................................... 23

*House v. Bell,*
   547 U.S. 518, 559-60 (2006) .................................................................. 3

*Huff v. DeKalb Cty., Ga.,*
   516 F.3d 1273 (11th Cir. 2008) …. 10, 11

*Johnson v. Serenity Transportation, Inc.,*
   2016 WL 1569984 (N.D. Cal. 2016)....................................................... 19, 21

ii

*Knickerbocker v. City of Stockton,*
    81 F.3d 907, 910 (9th Cir.1996) .......................................................... 13

*Lambert v. Ackerley,*
    180 F.3d 997, 1007 (9th Cir.1999) .................................................. 14, 21

*McDonnell-Douglas v. Green,*
    411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ........................ 13

*McLaughlin v. Richland Shoe Co.,*
    486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) ............ 16

*Mitchell v. Acosta Sales, LLC,*
    841 F.Supp.2d 1105, 1120 (C.D. Cal. 2011).................................... 22

*Partlow v. Jewish Orphans' Home of S. Cal., Inc.,*
    645 F.2d 757, 760 (9th Cir. 1981) .................................................... 21

*Pioneer Investment Servs. Co. v. Brunswick Assoc. Ltd. Partnership,*
    507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) .................... 22

Southern Calif. Gas Co. v. City of Santa Ana,
    336 F.3d 885, 888 (9th Cir. 2003) ...................................................... 3

*Steele v. Schafer,*
    535 F.3d 689, 692 (D.C. Cir. 2008) .................................................... 3

*Talavera v. Shah,*
    638 F.3d 303, 308 (D.C. Cir. 2011) .................................................... 3

*Thomas v. City of Beaverton,*
    379 F.3d 802, 812 (9th Cir.2004) ................................................ 14, 16

*Woods v. Vector Mktg. Corp.*, No. C-14-0264-EMC,
    2015 WL 1198593, at *6 (N.D. Cal. Mar. 16, 2015) ........................ 22

<u>STATUTES</u>

29 U.S.C. § 207k.................................................................................. passim

29 U.S.C. § 216(b) ...................................................................................... 20

29 U.S.C. § 255(a) ...................................................................................... 19

Fed. R. Civ. P. 56(a) ..................................................................................... 3

Fed. R. Evid. 408(b) ................................................................................... 22

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs Marcus Alfaro, Derrin Austin, and Piper Denlinger (collectively the "Plaintiffs") were previously employed as Emergency Resource Officers ("EROs") with the San Diego Fire-Rescue Department ("SDFD").  In that capacity, they were essentially go-betweens amongst SDFD employees actually fighting fires out in the field, on the one hand, and dispatchers and upper-level managers of the SDFD, on the other.   Under the FLSA, as analyzed by our Ninth Circuit in *Cleveland v. City of Los Angeles*, 420 F.3d 981 (9th Cir. 2005) and *Haro v. City of Los Angeles*, 745 F.3d 1249 (9th Cir. 2014), employees of fire departments are not exempt from overtime pay unless they actually wear fire helmets, fire turnouts, and (*inter alia*) utilize fire hoses to put out fires.

The evidence is undisputed that the EROs did none of these things as part of their ERO job.  Despite this, the SDFD and Defendant Fennessy determined the EROs were exempt from overtime under 29 U.S.C. § 207k (the "7k exemption"). Both *Cleveland*, and following it, *Haro*, are clear the EROs are not 7k exempt. When the EROs began to "make waves," by asking for their unpaid overtime and a 40-hour base work schedule, they were led to believe the Defendants intended to make a good faith effort to settle their cases pre-litigation.  Two years in, there was no settlement but the ERO Plaintiffs had been removed from their positions in retaliation for seeking to be paid according to the law.

The Plaintiffs were willfully and maliciously denied their pay and the process for their removal began nearly contemporaneously with their complaint of unpaid wages.  Defendants have denied Plaintiffs pay, their position, and their dignity all on the basis of an argument *Haro* and *Cleveland* do not apply here;  an argument that can only charitably be described as deliberately and demonstrably incorrect and insupportable. Based on the foregoing, as set forth in detail below, Plaintiffs were indisputably entitled to overtime pay and retaliated against for

1

asking for that pay, and as such, their motion for summary judgment should be granted.

## II.    <u>BACKGROUND / STATEMENT OF FACTS</u>

Rather than repeat the detailed facts set forth in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Doc. 62-1 at pp. 5-19), Plaintiffs herein incorporate by reference all facts and evidence set forth in their Opposition to Defendants' Motion for Summary Judgment, as well as all Declarations and Exhibits filed therewith. Plaintiffs further incorporate by reference the Declarations of Alfaro, Austin, Denlinger and Saldana concurrently filed herewith in support of their Motion for Summary Judgment.

In the position of ERO, plaintiffs worked exclusively in a City building called the Fire Communications Center ("FCC"). (Doc. 62-3, Pg. 140, ¶ 3; Doc. 62-3, Pg. 146, ¶ 3; Doc. 62-3, Pg. 152, ¶ 3.) While working in the position of ERO at the FCC, they never suppressed any fire. (*Id*.) The job of ERO involved working for the civilian Communications Center manager at the FCC (sometimes also referred to as the "dispatch center"). As EROs, plaintiffs were not obligated to engage in fire suppression. (Doc. 62-3, Pg. 140, ¶ 7; Doc. 62-3, Pg. 146, ¶ 7; Doc. 62-3, Pg. 152, ¶ 7.) Instead, the Computer Aided Dispatch ("CAD") system would pick units and send the units to the fire. (*Id*.) Fires are called in, dispatched, extinguished, and units returned home without EROs doing a single thing. (*Id*.) As EROs, the plaintiffs were *never* present at the scene of a fire, as this position only involved working from the FCC. (Doc. 62-3, Pg. 141, ¶ 8; Austin Doc. 62-3, Pg. 147, ¶ 8; Doc. 62-3, Pg. 153, ¶ 8.) EROs did not use their discretion or independent judgment in assigning resources for fires, instead, the CAD system picked the units that go to a particular incident, and the Move-Up-Module ("MUM") computer system selected the units that moved up/changed districts if necessary. (Doc. 62-3, Pg. 141, ¶ 9-11; Doc. 62-3, Pg. 147, ¶ 9-11; Doc. 62-3, Pg. 153, ¶ 9-11.)

# III. __ARGUMENT__

## A. __Standards for Summary Judgment__

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [thus] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).

When Rule 56 is invoked, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, to defeat the motion, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324 (citation omitted). The Defendants bear the burden of production and persuasion on their affirmative defenses, including on summary judgment. *Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). In this case, there is no genuine issue for trial with regard to Plaintiffs' non-exempt status, the willful and malicious denial of their pay, the retaliation against them, or the tolled of the limitation period.

## B. __Plaintiffs Alfaro, Austin and Denlinger Were Non-Exempt Employees Pursuant to *Haro* and *Cleveland* And Were Entitled To Overtime Pay__

In a nearly identical factual scenario, the 9th Circuit Court in *Haro v. City of Los Angeles*, 745 F.3d 1249 (9th Cir. 2014) held that dispatchers employed by the City of Los Angeles were not subject to the exemption because they were not engaged in "fire suppression" and, therefore, were entitled to overtime pay. At the

outset of the opinion, the Court in *Haro* laid out the key facts related to the job duties which led to the decision to find those employees non-exempt. The *Haro* employees "receive[d] emergency calls and send a dispatch message to the fire station and any specific vehicles to be dispatched." (*Id*. at p. 1252.) The plaintiff EROs in this case would see the facts from the dispatcher's call on their computer screen in the CAD system, which would send out a message for resources to be dispatched. (Doc 62-3, Ex. 1, 60:10-61:11.) As cited above, EROs did not have the authority or ability to upgrade the level of resources. (*Id*. at p. 62:2-25.)

The *Haro* Plaintiffs were responsible for supervising employees in the field, whereas the plaintiff EROs were not. (*Id*.) In addition, if an incident was large enough, *Haro* Plaintiffs were sent to the scene, whereas EROs were not. (*Id*.) The *Haro* Court found that no dispatcher in that case had been to a fire scene for at least 10 years, which is consistent with the Plaintiff EROs, who never reported to a fire scene in the ERO position. (*Id*.)

Similarly, the *Haro* Plaintiffs were not required to have any fire protective gear with them, were not required to handle firefighting equipment, and did not go into the field to physically engage in fire or rescue operations. (*Id*.) The same three facts are true about the plaintiff EROs, and are undisputed in this case. In *Haro*, the Plaintiffs were required to have been trained as a firefighter or paramedic for at least four years before becoming a dispatcher and the majority of them were firefighters. (*Id*.) In this case, each of the plaintiff EROs are trained as firefighters.

The *Haro* Plaintiffs worked out of a City building (City Hall), as did the plaintiff EROs (the Fire Communications Center). (*Id*. at p. 1257.) Moreover, neither the *Haro* dispatchers nor the plaintiff EROs "actively engage[d] the fire" in the course of their job duties. (*Id*.; Doc. 62-3, pg. 66 - Nos. 3 & 5; Doc. 62-3, pg. 74 - No. 11; Doc. 62-3, Ex. 4 - Fisher Depo., at pp. 44:17-45:4; Doc. 62-3, Ex. 5, 91:20-92:15.)

In determining whether the *Haro* dispatchers were exempt, the Court first

noted that "The FLSA is to be construed liberally in favor of employees; exemptions are narrowly construed against employers." (*Haro* at p. 1256.) The Court explained at the outset that under 7k exemption employees who are "engaged in fire protection" were exempt from overtime and then provided that:

> Section 203(y) in turn defines "employee in fire protection" as an employee who: (1) is trained in fire suppression; (2) has the legal authority and responsibility to engage in fire suppression; (3) is employed by a fire department; **and** (4) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk. The City bears the burden of proving that Plaintiffs meet all these requirements. See *Cleveland*, 420 F.3d at 988.

(*Id.*) In other words, it is the City's burden to prove that <u>all four</u> requirements are met by the work *actually performed* by the Plaintiffs.

Before going through its analysis, the *Haro* Court first referred back to its decision in *Cleveland*, where it "held that dual-function paramedics (those trained as both firefighters and paramedics) were entitled to standard overtime pay because they are not 'engaged in fire protection' under § 207(k) and § 203(y)." (*Haro* at p. 1256.) In analyzing the claims of the *Haro* dispatchers, the Court explained:

> Under the plain meaning of § 203(y), dispatchers do not have the "responsibility to engage in fire suppression." **The term most logically refers to those who are dispatched to the fire scene and actively engage the fire. Plaintiff dispatchers, working from the City Hall basement, do not suppress the fire; they send firefighters to the scene to suppress the fire**.

(*Id.* at p. 1257, (emphasis added).)

The same legal analysis applies to the plaintiff EROs herein because the facts are square with *Haro*. The EROs were never dispatched to a fire scene in that position. (Doc. 62-3, Ex. 2 - No. 3.) The EROs worked from a City building called the Fire Communications Center where they used a computer software system to send firefighters to a scene to suppress fire. (Motion at p. 3:7-8; (Doc. 62-3, Ex. 1, 60:10-61:11.) The *Haro* Court further found:

> *Cleveland* supports this conclusion. **In *Cleveland*, we associated fire suppression with actions that occur <u>at the physical scene of the fire itself</u>**. We noted that "when [paramedics] arrive at fire scenes.... they do not assist with any fire suppression." 420 F.3d at 984 (emphasis added). In fact, dispatchers are even further removed from fire suppression than the paramedics in *Cleveland*, since those paramedics at least traveled to the fire scene itself to perform medical services.

1  (*Id*. at p. 1257, (emphasis added).)

2      Under *Haro* and *Cleveland,* an employee who does not physically fight fires
3  at fire scenes is not considered engaged in "fire suppression" pursuant to sections
4  207k and 203y. Moreover, according to the City's own witness second-ranked Fire
5  official during this period, Assistant Chief Kenneth Barnes, "fire suppression"
6  means "working in a **fire station** in any capacity." (Emphasis added.) (Doc. 62-3,
7  Ex. 6, 33:24-34:4.)  Even under this more restrictive definition, it is undisputed in
8  this case that as EROs, plaintiffs did not work in a fire station in any capacity.
9  Further, the City, via Chief Javier Mainar, has understood and acknowledged that
10  *Haro* applied to the EROs dating back to at least November 2014.  (Doc. 62-3, Ex.
11  21., pg. 2) ("We'll have to comply with the law and adjust as needed. Hardly the
12  first or the last time for us.")

13      As referenced above, as EROs, plaintiffs Alfaro, Austin and Denlinger had a
14  computer system called the CAD, which would itself select resources to send out
15  based on the facts of a particular call.  (Doc. 62-3, Ex. 1, 60:10-61:11, 62:2-25.)
16  Finally, and relevant to both plaintiffs causes of action for violation of the FLSA
17  and retaliation, the Battalion Chiefs who replaced the plaintiffs are now paid
18  overtime for hours worked over 40 in one week.  (Doc. 62-3, Ex. 4, 65:7-66:1.)

19      The relevant job duties analyzed by the Court in *Haro* are on all fours with
20  the job duties of the plaintiff EROs in this case.  In fact, the plaintiffs here were
21  further removed from fire suppression than the those in *Haro* and the paramedics in
22  *Cleveland*, as those plaintiffs could potentially be sent to the scene of a fire as part
23  of their job.  The chart included in Plaintiffs' Opposition to Defendants' Motion
24  (Doc. 62-1 at pp.13-14.) includes each job duty analyzed by the Court in *Haro*,
25  leading to a non-exempt determination for not meeting the "fire suppression."

26      Additional detailed facts supporting the plaintiffs' position are set forth in
27  the declarations of Alfaro, Austin, Denlinger, Malbrough, Infantino and Arollado,
28  and  deposition  testimony  submitted  with  Plaintiffs'  Opposition  and  are

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

incorporated herein by reference. In sum, plaintiffs respectfully submit that they have dispositively proven they fall directly within the holdings of *Cleveland* and *Haro* and that as EROs they were non-exempt as a matter of law, based on indisputable facts regarding the job duties they actually performed, such that summary judgment should be granted in their favor.

## C. The City Wildly Mischaracterizes Both the *Haro* Holding and the Facts of this Case

Plaintiffs anticipate that Defendants will make three main arguments in opposition, as they did in their own motion, in support of their assertion that the plaintiff EROs do not qualify as non-exempt under *Haro*: 1. Plaintiffs were trained in fire suppression; 2. Plaintiffs had the "legal responsibility to engage in fire suppression"; and 3. Plaintiffs were "engaged in the response to emergency situations where life, property, or the environment was at risk." Each of these arguments are incorrect as discussed below.

### 1. Defendants' Contention: Plaintiffs Were Trained in Fire Suppression

This is an undisputed fact which does not support the City's position in any regard. In *Haro*, the plaintiff dispatchers had also been previously trained as firefighters. The Court explicitly found that this prior history of training had no bearing on whether the plaintiffs were 7k exempt, as the analysis involved whether, in their job positions at issue, they physically appeared at the scenes of fires or physically fought fires. The same is true here – it is an irrelevant fact that has no bearing on the outcome of the exemption analysis.

### 2. Defendants' Contention: Plaintiffs had the "legal responsibility to engage in fire suppression"

This argument is both misguided and incorrect. As *Haro* explained:

> Under the plain meaning of § 203(y), dispatchers do not have the **"responsibility to engage in fire suppression." The term most logically refers to those who are dispatched to the fire scene and actively engage the fire**. Plaintiff dispatchers, working from the City Hall basement, **do not suppress the fire; they send firefighters to the scene to suppress the fire.**

> *Cleveland* supports this conclusion. **In *Cleveland*, we associated fire suppression with actions that occur at the physical scene of the fire itself**. We noted that "when [paramedics] arrive at fire scenes.... they do not assist with any fire suppression." 420 F.3d at 984 (emphasis added). In fact, dispatchers are even further removed from

fire suppression than the paramedics in Cleveland, since those paramedics at least traveled to the fire scene itself to perform medical services.

(*Haro* at p. 1257.)

It is undisputed in this case that the plaintiffs' jobs as EROs did not involve physically going to a fire scene. It is undisputed in this case that the plaintiffs' jobs as EROs did not involve actively engaging the fire at a fire scene. It is undisputed in this case that as EROs, the plaintiffs never wore a helmet, used a ladder, wore a turnout or held a fire hose.

Even more, as cited above, Assistant Chief Kenneth Barnes directly contradicted the interpretation of fire suppression being set forth in the Motion, explaining: **"fire suppression" means "working in a fire station in any capacity."** (Ex. 6, 33:24-34:4, (emphasis added).) It is undisputed in this case that as EROs, plaintiffs did not work in a fire station in any capacity. Based on the foregoing, there are no triable issues of material fact with regard to this argument, as the undisputed facts support granting summary judgment for Plaintiffs.

**3. Defendants' Contention: Plaintiffs were "engaged in the response to emergency situations where life, property, or the environment was at risk"**

As an initial matter, this argument is only one of four prongs of the section 203y definition, <u>all of which must be established</u> to prove exemption. As set forth above, plaintiffs have already defeated the second prong based on undisputed material facts. As such, this fourth prong is irrelevant and fails to support the City's position on its own.

Nonetheless, Defendants' final contention is that Plaintiffs are 7k exempt because they were "engaged in the response to emergency situations where life, property, or the environment was at risk." (City Motion at p. 11:8-12:28.) Put differently, Defendants argue that the plaintiffs job duties "relate directly to managing resources for fire suppression." (City Motion at p. 11:25-26.) In other words, they claim that the plaintiff EROs were exempt because they had a direct connection to fighting fires. In so doing, Defendants are literally rearguing what

was already explicitly rejected in *Haro*:

> In its defense, the City argues that 'responsibility to engage in fire suppression' should be expanded to all those employees who make a direct causal contribution to combating fire, whether or not they are physically present at the fire itself. **We decline such an invitation to expand the FLSA's definition**.

(*Haro* at p. 1257, (emphasis added).)

Moreover, in *Haro,* the City of Los Angeles argued that, "because dispatchers and aeromedical technicians contribute in a direct and vital manner to the Fire Department's suppression of fires, they meet the requirements of § 203(y) and thus come within the scope of § 207(k)." (*Id*. at p. 1255). The *Haro* Court flatly rejected this argument too in determining that the three-year statute of limitations for willfulness applied.

Within this argument Defendants assert, on the one hand, that this case is the opposite of *Haro* and *Cleveland* because the plaintiffs had to rely on their prior training, knowledge, and experience to perform the ERO duties. On the other hand, to try to counter the retaliation claim, defendant Fennessy testified at deposition that the EROs were replaced because their prior training, knowledge and experience was insufficient to perform the job duties. (Doc. 62-3, Ex. 5, 48:16-49:9.) More specifically, Fennessy testified that: "The captains [as] EROs I never believed were a good fit in that position . . . We asked the captains to do second-level supervisor work and authority, and they didn't have the training, the skills, or the ability to do so in my opinion." (*Id*.) This is a party admission by the former Fire Chief made under oath. Defendants cannot have it both ways.

Next, Defendants argue that under Plaintiffs' analysis in this case, any firefighter – including Battalion Chiefs – who do not respond to the scene of a fire would need to be reclassified as non-7k exempt. (Motion at p. 12:22-26.) That is true. And it is the very reason why the City has classified the Battalion Chiefs who replaced the plaintiffs in this case as non-exempt and pays them overtime for work over 40 hours in one week. (Doc. 62-3, Ex. 4, 65:7-66:1.). Throughout their own Motion, and likely in their forthcoming Opposition, the Defendants make numerous

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

contradictory arguments and misrepresented both the applicable law and the facts here. Plaintiff EROs *were not* 7k exempt pursuant to *Haro* based on facts that are not, and cannot be, legitimately disputed.

**4. The 11th Circuit Cases Cited By Defendants Are Neither Controlling Law Nor Applicable to the Facts of this Case**

Plaintiffs anticipate that Defendants will once again cite to *Huff v. DeKalb Cty., Ga.*, 516 F.3d 1273 (11th Cir. 2008) in order to prop up their facially invalid defenses. *Huff* is both immediately distinguishable and inapposite. The plaintiffs in *Huff* were "firefighter/paramedics." (*Id*. at p. 1274.) These firefighter/paramedics could be physically "assigned to fire apparatuses, which include Rescues, Trucks, Squads, Ladders, Technical Rescue Trucks, or Engines," unlike the plaintiff EROs or the *Haro* dispatchers who worked out of City buildings and not in fire stations or on fire apparatuses. (*Id*. at p. 1274.) In addition, the firefighter/paramedics in *Huff* were classified as "Fire Rescue personnel" and "All Fire & Rescue personnel at a fire scene [we]re required to wear fire protection gear, called 'turn-out' gear, which include[d] protective clothing, air masks for breathing, firefighting boots, and a fire helmet." (*Id*. at p. 1275.) It is undisputed that the plaintiff EROs: 1) never reported to a fire scene; and 2) never wore turn-outs in their positions as EROs.

Critically, in *Huff* – **"All Plaintiffs were assigned to fire stations"** – a dramatic difference from the factual scenarios in *Haro* and the instant action. (*Id*. at p. 1275.) Further, "The job descriptions of Firefighter/Paramedics include performing basic firefighting and life rescue duties, in addition to responding to medical emergencies, disasters, multi-casualty incidents, and other types of emergencies." (*Id*. at p. 1275.) The other category of plaintiffs in *Huff* were the "Fire Medics." "Fire Medics are responsible for firefighting, extrication, life rescue, and providing advanced emergency medical care for the sick and injured. They are required to perform firefighting . . ." (*Id*.) It is difficult to imagine a case more factually different in the key areas of analysis than *Huff,* on the one hand, and

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

*Haro* and the present action on the other hand. The Court in *Huff* found that *Cleveland* was distinguishable – in other words, the Eleventh Circuit found the cases reconcilable because of their disparate facts rather than disagreeing with the Ninth Circuit's reasoning -- because all of the plaintiffs in *Huff* had to wear turn-out gear, were assigned to ride in fire engines, and if so ordered had the obligation to physically fight fires, while the *Cleveland* plaintiffs were not. (*Id*. at p. 1279.) None of these facts apply to the plaintiff EROs as set forth above in detail. It is undisputed in this case that as EROs, the plaintiffs in this case never had as a job duty the obligation to physically fight fires and the City can produce no evidence to the contrary because none exists. In sum, *Huff* fails to provide any support whatsoever to the City's position.

### D. Plaintiffs Were Not Exempt Under The Administrative Exemption

Plaintiffs believe that the City abandoned any argument related to the Administrative exemption (29 U.S.C. § 213(a)(1), 29 C.F.R. § 541), as it is directly contradictory to, and mutually exclusive of, its argument that Plaintiffs were engaged in "fire suppression." Nonetheless, Plaintiffs address the inapplicability of this exemption in order to seek summary adjudication of the same.

In order to be exempt under the Administrative exemption, the employee's primary duty must be the performance of office or non-manual work directly related to the management or general business operations of the employer; and the employee's primary duties must include the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200. However, the FLSA exemptions do not apply to police officers, firefighters, et al., who perform work such as controlling or extinguishing fires of any time . . . or other similar work. 29 C.F.R. § 541.3(b).

As an initial matter, because Defendants have taken the position that Plaintiffs were performing "fire suppression" at all times, they cannot also argue that the Administrative exemption applies. *Id*. Further, based on the undisputed

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

facts set forth herein, Plaintiffs were not: a) managing the fire department or its general business; or b) engaging in primary duties that involved the exercise of discretion or independent judgment with regard to matters of significance.

"Administrative work is the work performed by so-called white collar employees engaged in 'servicing' a business—as, for example, 'advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.' 29 C.F.R. § 541.205(b)."

*Copas v. E. Bay Mun. Util. Dist.*, 61 F. Supp. 2d 1017, 1021 (N.D. Cal. 1999).
> Further, with regard to the element of "discretion or independent judgment": The exercise of independent judgment involves "**the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered.**" 29 U.S.C. § 541.207(a). An employee who exercises independent judgment "**has the authority or power to make an independent choice, free from immediate direction or supervision.**" *Id.*

*Copas*, supra, at p. 1023 (N.D. Cal. 1999), (emphasis added). As set forth above, the policies for fire response are set by higher level department employees in the "response matrix," and decisions regarding dispatching resources are made by the CAD system or the EROs' superiors.

The CAD program made the decisions about staffing medical and fire emergencies in the City pursuant to policies pre-programmed into the system and in response to input made by dispatchers. (Doc. 62-3, Ex. 1 at, 60:6-14). The EROs had no ability or right to deviate from those pre-programmed policies. See Ex. 1, 60:15-62:4. EROs made no decisions regarding staffing for a fire or medical aid, and could not authorize any requests for additional staffing for a fire incident; the incident commander would make that request to dispatch and a decision would be made at the Chief level, never by an ERO. (Doc. 62-3, Ex. 1, 54:5-56:12; Doc. 62-3, Doc. 62-3, Ex. 6, Barnes Depo., at pp. 23:11-24:16). EROs also occasionally assisted dispatchers on the dispatch floor with certain nomenclature, such as that used in response to medical emergencies, traffic accidents, and towing procedures. (Doc. 62-3, Ex.1, 43:9-44:7).

The EROs' immediate supervisor was a civilian employee named Susan Infantino. (Doc. 62-3, Ex. 1, 63:8-15; Doc. 62-3, Ex. 15, Infantino Decl., ¶ 2). EROs also reported to shift commanders, Deputy Chiefs who made actual emergency response decisions and were authorized to deviate from the CAD's pre-programmed policies. (Austin Depo., *Id*.). In short, the CAD directs dispatchers how to staff emergency calls and EROs had no input in those decisions. (Doc. 62-3, Ex. 1, 71:6-18).

Based on the foregoing, as well as the detailed facts set forth in the declarations of Alfaro, Austin, Denlinger, Malbrough, Infantino and Arollado, which are incorporated herein by reference, the job duties actually performed by the EROs did not involve performing work related to the management or general business operations of the fire department, and did not include primary duties that involved the exercise of discretion or independent judgment with regard to matters of significance, and instead simply followed pre-existing policies, along with the CAD system and the directions of their superiors. The Administrative exemption is wholly inapplicable to the Plaintiffs.

**E.** **Plaintiffs Have Established a *Prima-Facie* Case of Retaliation**

Retaliation claims are evaluated under the *McDonnell-Douglas v. Green* burden-shifting framework. *McDonnell-Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell-Douglas,* the analysis begins with whether the plaintiffs have established a *prima-facie* case. *Knickerbocker v. City of Stockton*, 81 F.3d 907, 910 (9th Cir.1996). If the plaintiff has done so, the burden shifts to the Defendants to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Avila v. Los Angeles Police Dep't*, 758 F.3d 1096, 1101 (9th Cir.2014). If the Defendants support that justification with substantial evidence, the burden shifts back to the plaintiffs to demonstrate that the reason articulated is mere pretext for a retaliatory motive.

**1.** **Plaintiffs' *Prima-Facie* Case**

To establish a prima facie case of retaliation, a plaintiff must show: (a) that

the Defendants were aware of plaintiff's participation in a protected activity; (b) that an adverse employment action was taken against the plaintiffs; and, (c) that the protected activity was a substantial motivating factor in the adverse employment action as to that plaintiff. *Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir.1999). Both direct and circumstantial evidence suffices to establish that the protected activity was a substantial factor in the adverse action. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir.2003) (a plaintiff can satisfy the "substantial factor" standard through several avenues, such as through timing or statements by the employer showing its disapproval of the protected activity or by showing that the employer's proffered reasons for the adverse action were pretextual). Timing alone demonstrates causation when Defendants have taken adverse actions against Plaintiffs closely following their protected activity. *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir.2004).

The Defendants do not dispute that Plaintiffs engaged in protected activity; nor could they because Defendant Fennessy admits he received and reviewed a letter requesting overtime pay under Haro sent on behalf of Plaintiffs. He considered it a "threat of litigation." Fennessy Depo, 16:8-17:14. Fennessy also stated, as recorded in notes taken by the City's Abby Jarl-Velz during meet and confer discussions, that he was "frustrated" with the EROs. (Doc. 62-3, Ex. 7).

### a.    Adverse Employment Action

As the Plaintiffs deposition testimony and declarations collectively state, the Plaintiffs loved working as EROs and the removal from those positions has caused a shortening of their work-life expectancy at the SDFD by three (3) years at least. The reason is that the position of ERO creates less wear and tear on their bodies, precisely because the Plaintiffs are not out fighting fires while they worked as EROs. This shorting work-life constitutes an adverse employment action.

Plaintiffs were entitled to overtime pay. Even the Defendants' attorney and "lead negotiator", Tim Davis, stated that during discussions about the case. (Doc.

62-3, Arrollado Decl., ¶6).   Yet, the Defendants refused to pay the Plaintiffs overtime and chose instead to remove them from service as EROs.  That change in the terms and conditions of their employment is an adverse employment action, not least of which owing to the fact that there are now *__four__* Battalion Chiefs performing the same function as the EROs, all at higher base salaries, and all earning overtime for hours worked in excess of 40 as required by *Haro*. Doc. 62-3, Arrollado Decl., ¶9. Furthermore, despite their several requests, over multiple years, the Defendants refused to pay Plaintiffs overtime wages while they were still employed EROs. That too is an adverse employment action.

That Defendants now advance a credulous claim that Defendant Fennessy told a couple people around the time of the *Haro* decision that he always dreamed of "restructuring" the ERO position does not insulate the Defendants from exposure stemming from adverse employment actions.  Neither does the fact that they made the decision following Plaintiffs' complaints for appropriate pay and, as part of that process, Defendants were forced to formally notify Local 145 of their plans and discuss the same.   There is no argument advanced, nor could there be, that the Defendants were ineligible to complete the same process even if Local 145 had not listened to the plan and agreed to the same.   The Defendants would have unilaterally made the change over the objection of Local 145 anyway, so this suggestion is little more than a "red herring."  After all, reassignment "…to a less desirable position without the opportunity for overtime pay […] likely constitutes an adverse employment action" precluding summary judgment. *Chavez v. City of Los Angeles*, 111 Fed.Appx. 881, 884 (9th Cir. 2004), citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847–48 (9th Cir.2004) (construing Title VII claim).   Once again, the Defendants' focus on out-of-circuit authority contrary to binding, Ninth Circuit precedent is unavailing.

### b.    Causal Link is Established by the City's Own Evidence

It is undisputed, as more fully set forth above, that Brian Fennessy stated at

deposition that he reviewed the Plaintiffs' initial letter requesting overtime pay in July 2014. The City proffers the Declaration of the current Fire Chief, Colin Stowell, that states: "I recall Brian Fennessy discussing his idea of restructuring the Fire Communications Center and recruiting Fire Chiefs to perform the duties of the Fire Captains in the Emergency Resource Officer ("ERO") role as early as **July of 2014**." (Emphasis added). Exhibit I, pg. 1, ¶2. Not coincidentally, the very same month as he became aware of the Plaintiffs' claims. The declaration of Stephen Ricci is less specific. Neither makes any reference to the timing of Plaintiffs' request for pay in July 2014. The timing difference can be no more than four weeks following Plaintiffs' initial request, which Fennessy stated he reviewed commensurate in time with the delivery of the letter because he and the Department viewed it as a "threat of litigation." This temporal nexus is sufficient to demonstrate a causal link. See, *Thomas*, *supra*. Moreover, there is no direct evidence of a separate motive apart from Fennessy's own self-serving testimony. As such, the motion should be granted as to Plaintiffs' retaliation claim.

**F.     The Statute of Limitations Should Be Extended and Plaintiffs Are Entitled To Both Liquidated And Punitive Damages**

**1.     Defendants Make the *Exact* Same Argument Rejected in *Haro* and *Cleveland* – Proving Their Position is Both Incorrect and Willful**

Plaintiffs have gone into great detail hereinabove regarding the fact that the Defendants are making the exact same arguments that were explicitly considered – and rejected – in *Haro*, as well as *Cleveland*. Plaintiffs submit that this goes *well beyond* creating a triable issue as to willfulness – it outright proves it. "To show willfulness, a plaintiff must demonstrate that the employer 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). An employer who knows of a risk that its conduct is contrary to law, yet disregards that risk, acts willfully. *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908–09 (9th Cir.2003)." (*Haro*, *supra* at p. 1258.)

The Defendants, at all relevant times, either knew about or showed reckless

16

disregard of the holdings of *Haro* and *Cleveland* since 2014 and 2005, respectively. In reality, the City has known throughout that the plaintiff EROs **never once** while working in the ERO position physically went to a fire scene or physically fought a fire. Nonetheless, the Defendants declined to properly classify the plaintiff EROs in the first place *and then*, when the plaintiff EROs asked to be paid for the overtime they had worked the Defendants *still* failed to acknowledge the clear application of these cases to the ERO positions and again refused to pay the past-due overtime then it removed them from those positions. Next, the City engaged the plaintiff EROs in settlement talks despite never having any actual authority to pay any amount of money, in an attempt to lead the plaintiffs on and forestall litigation in order to waste away years of overtime pay that was owed. What the City of San Diego is doing in this case in general, and in its Motion specifically, is saying that it is above the law.

The City does not like the 9th Circuit's interpretation of the FLSA, so it refuses to pay the plaintiff EROs in accordance with the law. That is exactly what is meant by "willful" conduct. Defendant Brian Fennessy admitted as much at deposition, where he explained that he did not agree with the 9th Circuit's interpretation of the law and, in particular, its definition of "fire suppression." Fennessy testified that, after reading the *Haro* case:

> I viewed it as -- in this case I believe it was the [Haro]judge viewed those duties very narrowly and that fire suppression and protection was much broader than what he, as I recall, defined as direct fire protection or suppression…
> Again my rudimentary view is he took a very narrow view of what fire protection is. Fire protection as a professional, somebody that's been involved in fire protection for 40 years, I viewed the interpretation at the time. And as I recall it was very, very narrow and not inclusive of all the other duties that firefighters perform in fire . . .

(Doc. 62-3, Ex. 5, 20:21-21:25.) Fennessy was the Fire Chief at the time the plaintiff EROs were removed from the positions after requesting overtime pay. His testimony is a party admission attributable to both himself and the City, proving that the City knew that what the EROs were doing did not qualify as "fire suppression" under *Haro*, but that the City believed the definition should be

broader and as such, it refused to pay overtime as required by the FLSA.

On October 31, 2014, Ken Barnes forwarded to Chief Javier Mainar an e-mail from his son with a legal analysis of the applicability of *Haro* to the EROs, which explained that the City would owe overtime pay as a result of *Haro*. In response, Chief Javier Mainar acknowledged the need to pay the EROs overtime as a result, writing, in part: "In the end, we'll have to comply with the law and adjust as needed. Hardly the first or last time for us." (Doc. 62-3, Ex. 21).

The *Haro* Court found that the City's conduct was willful because the 7k exemption had been litigated in the *Cleveland* case and the Court issued a ruling clearly outlining the application of the exemption, yet the City continued to classify the *Haro* dispatchers as exempt. In addition, the *Haro* Court found that the City's failure to "take any steps to obtain an opinion letter from the Department of Labor regarding Plaintiffs' positions" despite knowledge of "red flags" showed willfulness. (*Id.* at p. 1258.)

In this case, the City of San Diego was aware of the ruling in *Cleveland* for many years prior to both: 1) classifying the plaintiff EROs as exempt; and 2) receiving the plaintiff EROs' request to be paid overtime. As explained in the Complaint (and misrepresented in Defendants' motion), there was no reasonable argument that the plaintiff EROs were non-exempt as a result of the *Cleveland* ruling. However, after the *Haro* ruling in 2014, there was absolutely no doubt. Nonetheless, despite full knowledge of both decisions, the City took no steps to either correctly classify the plaintiff EROs or to seek an opinion letter from the Department of Labor. Instead, it simply wrongfully classified the plaintiff EROs as exempt because it disagreed with the 9th Circuit's interpretation of the law, despite Fennessy and Mainar's knowledge of the applicability of *Haro*. Even more, after its error was pointed out by the plaintiffs, the City has not only refused to pay them for overtime worked, but it: **1) removed them from the ERO position; 2) classified their replacements (who were of a higher rank) as non-exempt; and**

1    **2) pays the plaintiffs' replacements on a 40 hour workweek, with overtime pay**
2 **for hours worked over 40 in one week**.  (Doc. 62-3, Ex. 4, 65:7-66:1.) The City's
3 conduct against the plaintiff EROs was not only willful, but also retaliatory and
4 vengeful.  The City has shown its true colors and its conduct in relation to the
5 plaintiff EROs is the quintessential example of willfulness.

6           **a.**     **Three Year Statute Applies**

7      "The typical statute of limitations for an FLSA violation is two years. See 29
8 U.S.C. § 255(a). However, the statute of limitations is extended to three years
9 where the violation is willful. *Id*. An employer's violation is willful, triggering the
10 longer limitations period, when the employer knowingly violated the FLSA or if it
11 "disregarded the very possibility that it was violating the statute." *Alvarez v. IBP*,
12 Inc., 339 F.3d 894, 908 (9th Cir. 2003) (internal quotation marks and citation
13 omitted). Put another way, the determination of willfulness is a mixed question of
14 law and fact that generally requires evidence of an employer's "knowing or reckless
15 disregard for the matter of whether its conduct was prohibited by the statute." *Id*.
16 (citations omitted)." *Johnson v. Serenity Transportation, Inc.*, 2016 WL 1569984
17 (N.D. Cal. 2016).

18      As discussed at length above, there is simply no creditable basis upon which
19 to find that the Defendants' refusal to pay overtime to the Plaintiffs was a good
20 faith mistake because of the asserted "limited application" of *Haro* and *Cleveland*.
21 Nothing could be further from the truth.  Neither case was limited in its application
22 and, even if they had been, both cases – in particular *Haro* – are on all fours with
23 the instant matter.  *See* discussion of *Haro* and related chart (Doc. 62-1 at pp.13-
24 14).  **Indeed, in *Haro* the affected Fire Department was also subjected to a**
25 **finding of willfulness because it ignored the prior holding of *Cleveland*.**  *Haro*,
26 745 F.3d at 1258-1259.  There is no dispute here that the SDFD knew of both
27 holdings.

28      In fact, Defendant Fennessy flatly stated at deposition that he was aware of

the case, but disagreed with the Ninth Circuit's analysis so no changes to their exemption analysis were made. The Defendants have acted willfully, maliciously, and despicably and the undisputed evidence demonstrates nothing to the contrary. The statute of limitations for this claim is three years plus any tolling period. (Discussed, *infra*.).

### b.    Plaintiffs Are Entitled to Liquidated Damages

"FLSA plaintiffs are entitled to liquidated damages in the amount of the unpaid overtime compensation (i.e. double damages). 29 U.S.C. § 216(b); *Chao v. A-1 Medical Servcs., Inc.*, 346 F.3d 908, 919–20 (9th Cir. 2003). Double damages are the norm; single damages are the exception. *Chao*, 346 F.3d at 920. Liquidated damages are 'mandatory' unless the employer can overcome the 'difficult' burden of proving both subjective 'good faith' and objectively 'reasonable grounds' for believing that it was not violating the FLSA. *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909, 910 (9th Cir. 2003)." *Haro*, 745 F.3d at 1259.

Plaintiffs herein have established willfulness on the part of the City, and a complete absence of "good faith" or "reasonable grounds" for denying Plaintiffs overtime pay. First, the Defendants recycle their well-worn and idiosyncratic characterization of Plaintiffs' complaint as somehow conceding the point; which it clearly does not. Second, Defendants have argued that trial counsel, the Office of the City Attorney, authored a "public memorandum" at the request of the Department that "said we could do it, so we did." However, when the Plaintiffs sought discovery of the factual and legal basis for that "public memorandum" in light of the Defendants' claims (as here) that it was following the advice of counsel, the Defendants refused to produce any information or allow any testimony on the matter. Because the Defendants cannot use advice of counsel as a shield and a sword, this argument has been waived.[1]    *Chiron Corp. v. Genentech, Inc.*, 179 F.

---

[1] This claim of the Defendants is also the subject of a pending motion for protective order. Doc. No. 45.

Supp. 2d 1182, 1185 (E.D. Cal. 2001); *See also*, *Chevron Corp. v. Penzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). The Defendants' suggestion *Haro* somehow is inapplicable to this case deliberately overlooks key facts in this matter and *Haro* and otherwise relies on an analysis not submitted in good faith.

### c.      Plaintiffs Are Entitled To Punitive Damages

Looking once again to the decisions of the Eleventh Circuit, Defendants argue there is a split in authority between that Circuit and ***our own Ninth Circuit*** concerning whether punitive damages are available for retaliation claims under the FLSA. Once again, the Defendants advance arguments plainly contrary to controlling authority, and claim to do so in good faith. Respectfully, Plaintiffs disagree. Defendants concede Ninth Circuit authority approves of punitive damages for FLSA retaliation claims (*See Lambert v. Ackerly*, 180 F.3d 997, 1007 (9th Cir. 1999)), so Plaintiffs defer to that controlling authority.

### d.      Plaintiffs' Claim for Punitive Damages is Well-Supported

Plaintiffs have established entitlement to punitive damages against Defendant Fennessy for the same reasons that the retaliation claim itself has been proven. Punitive damages are awardable when a defendant has acted with malice or "reckless disregard for the rights of others." *Lambert*, 180 F.3d at 1009-1010. This is essentially the same inquiry as the willfulness inquiry above. Because Defendants' conduct was willful and malicious, that conduct also establishes Plaintiffs' entitlement to punitive damages against Fennessy. Accordingly, summary judgment should be granted as to Plaintiffs' punitive damages claim.

### e.      The Statute of Limitations is Tolled

### i.      Equitable Tolling Applies

The statute of limitations for the FLSA is subject to equitable tolling, *see Partlow v. Jewish Orphans' Home of S. Cal., Inc.*, 645 F.2d 757, 760 (9th Cir. 1981). At bottom, the inquiry assesses the fairness to both parties. *Woods v. Vector Mktg. Corp.*, No. C-14-0264-EMC, 2015 WL 1198593, at *6 (N.D. Cal. Mar. 16,

1  2015) (citation omitted).

2      Equitable tolling is permitted even when a plaintiff has a lawyer if the
3  interests of justice so require and there is no prejudice to the defendant. *Pioneer*
4  *Investment Servs. Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 113
5  S.Ct. 1489, 123 L.Ed.2d 74 (1993). Equitable tolling is appropriate where plaintiffs
6  have diligently pursued their rights under the FLSA and are without fault for the
7  delay. *Mitchell v. Acosta Sales, LLC*, 841 F.Supp.2d 1105, 1120 (C.D. Cal. 2011).
8  Moreover, Fed. R. Evid. 408(b) expressly suggests that settlement negotiations is a
9  basis for excusing claims of undue delay. ("The court may admit this evidence for
10  another purpose, such as proving a witness's bias or prejudice, negating a
11  contention of undue delay…[.]").

12      Exhibit 22 (PLT 104) is a document created by the Defendants' Financial
13  Management Department and dated according to its markings as created and
14  distributed on ***June 9, 2016***. The document purports to be an offer of settlement
15  which includes within it pay calculated beginning in July of 2012. That is, it is
16  dated for two years beginning the date on which the Plaintiffs first sought payment
17  (in July of 2014) by way of Alan Arrollado's letter. This document, and the
18  discussion that accompanied it led the Plaintiffs unmistakably to believe, rightfully
19  and in good faith, that their claims were tolled. This document post-dates the
20  Plaintiffs July 2014 initial request for payment by almost two years. It post-dates
21  the City Attorney's self-serving "legal memorandum" – City's Exhibit H to Tejura
22  Declaration – by almost a full year. It also pre-dates Mr. Davis's alleged June 29,
23  2016 statement to Ms. Steiner – objected to as hearsay and disputed – by 20 days.
24  That is, even crediting only the City's documents and statements and disregarding
25  any disputes created by Plaintiffs' arguments and evidence, it is undisputed that
26  Plaintiffs were led to believe their limitations period was agreeably tolled until June
27  29, 2016.

28      However, Mr. Arrollado's declaration clears all ambiguity here. He was

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

never told by anyone that there would be an attempt by the City to argue the limitations period notwithstanding Mr. Davis's statement that no lawsuit was necessary here because he conceded the City had no defense to the wage and hour claims. Mr. Arrollado even went so far as to re-state the obvious throughout these discussions: that the Plaintiffs were not filing their lawsuit in reliance on the City's representation they were working in good faith to settle the case short of litigation. Exhibit 19 is direct evidence that Mr. Arrollado's reliance was sound in that an offer was conveyed even after the City Attorney's disputed "legal memorandum" was issued.

Whether based upon equitable tolling, or equitable estoppel, the equities favor the suspension of the limitations period from the first date for back-pay negotiated upon (July 2, 2012) to the date of filing of the complaint in this case. Furthermore, that proposed limitations period should be extended by a year if the Court finds, as Plaintiffs contend the undisputed evidence demonstrates, that the Defendants' refusal to pay Plaintiffs overtime was a willful violation of the FLSA.

## 2. Equitable Estoppel Applies Here As Well

Defendants' motion sets forth a brief section in which it asserts that Plaintiffs cannot establish equitable estoppel. The motion cites to *Holland v. Norwegian Cruise Lines*, 765 F. Supp. 1000, 1002-03 (N.D. Cal. 1990) for the following required elements: (1) The party to be estopped must be apprised of the facts; (2) The other party must be ignorant of the true state of facts, and the party to be estopped must have acted so that the other party had a right to believe that the party intended its conduct to be acted upon; and (3) The other party must have relied on the conduct to its prejudice.

Each of these elements are established by the Declaration of Alan Arrollado. At the time that Plaintiffs were EROs requesting to be paid for overtime, Arrollado was a Captain for the City of San Diego Fire-Rescue Department and the President of the Local 145, which represented the Plaintiffs. (Doc. 62-3, Arrollado Decl. ¶ 2.)

Arrollado personally engaged in settlement negotiations with representatives of the City of San Diego on behalf of the Plaintiffs related to the Plaintiffs' overtime claims. (*Id*. at ¶ 3.) During the course of those negotiations, Arrollado was told words to the effect of "we can settle this without a lawsuit" and "we don't need to go to court on this, we can get it settled." (*Id*. at ¶ 4.) In addition, Arrollado was presented with a spreadsheet of settlement numbers calculating overtime pay owed going back the full applicable time frame, which gave him the impression that the City was not making the statute of limitations an issue. (*Id*. at ¶ 5.) It was Arrollado's impression based on the words and conduct of the City that the time frame for paying back the Plaintiffs was not being challenged by the City and that the City's representatives were going to solicit settlement authority from the City Council. (*Id*.)

One of the attorneys representing the City, Timothy Davis, told Arrollado words to the effect of "Haro is the law and the city is violating with the EROs, they're screwed on this, they're going to lose, they need to settle." (*Id*. at ¶ 6.) Moreover, during their meetings, Arrollado informed Davis and other representatives of the City it was his impression that the Plaintiffs were forestalling the filing of a complaint in this case because they were engaging in settlement discussions and that it was his intent that the Plaintiffs not be disadvantaged in any way by making this effort to settle. (*Id*. at ¶ 7.) Arrollado was never told by anyone representing the City — not Tim Davis or any other individual — that the City intended to interpose a statute of limitations defense if Plaintiffs filed suit, including an attempt to exclude a period of time for which all parties agreed to explore repayment that began at or about the date of Arrollado's initial letter to the City requesting such payment in July of 2014. (*Id*.) Had Arrollado been aware the City intended to take such a position, he and Local 145 would have ensured that each of these Plaintiffs would have immediately filed suit. (*Id*.)

The City asserts: "In order to assert successfully the doctrine of equitable

estoppel, a plaintiff must show that the defendant's conduct was so misleading as to have caused the plaintiff's failure to file suit." (*Atkins v. Union Pac. R. Co.*, 753 F.2d 776, 777 (9th Cir. 1985).) This is exactly what is established by the Declaration of Arrollado. The City, via its representatives including attorney Davis, told Arrollado (who was representing Plaintiffs on behalf of the Union) that: "we can settle this without a lawsuit"; "we don't need to go to court"; "*Haro* is the law and the City is violating with the EROs, they're screwed on this, they're going to lose, they need to settle." (Arrollado Decl. at ¶¶ 4-6.) In addition, after telling Plaintiffs (via Arrollado) that a lawsuit was not needed, the City presented a settlement spreadsheet going back the full applicable time frame. The combination of these facts and circumstances establish that the City's conduct was so misleading as to have caused the Plaintiffs' failure to file suit at an earlier date.

In short, Plaintiffs were tricked into wasting away time for which they were owed overtime based on false statements and/or misrepresentations by the City and its representatives. This is supported by the Declaration of Arrollado and, as such, equitable estoppel should be applied to extend the limitations period back to July 2, 2012. Based on all of the foregoing, Plaintiffs submit that each of the elements of equitable estoppel have been established.

### G. Plaintiffs' Damages

As set forth in the detailed declarations of Alfaro, Austin and Denlinger and exhibits thereto, Plaintiffs' respective damages as to unpaid overtime and liquidated damages are as follows:

**Marcus Alfaro: $710,926.00.** (Alfaro Decl. ¶¶ 53-55, Exhs. A-D.)
**Derrin Austin: $689,362.00.** (Austin Decl. ¶¶ 53-55, Exhs. A-D.)
**Piper Denlinger: $ 365,246.00.** (Denlinger Decl. ¶¶ 53-55, Exhs. A-D.)

### IV. CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment in its entirety, as no triable issues of material fact exist.

Dated: April 8, 2019                    **SHEWRY & SALDAÑA, LLP**

                                 By:  *s/Christopher C. Saldaña*
                                      Christopher C. Saldaña
                                      SHEWRY & SALDANA
                                      Attorneys for Plaintiffs